IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HOPE P. BRENNAN,

                Plaintiff,                OPINION AND ORDER

v.

                                                  21-cv-365-wmc

BNSF RAILWAY COMPANY.

                Defendants.

---

Plaintiff Hope Brennan brought suit against BNSF Railway Company ("BNSF") alleging violations of the Locomotive Inspection Act, 49 U.S.C. § 20701, *et seq*. ("LIA"), and Federal Employers' Liability Act, 45 U.S.C. § 57, *et seq*. ("FELA") after she was injured in the course of her job as a brakeman for the railway. BNSF seeks summary judgment (dkt. #12) ahead of the October 31, 2022, trial date. For the reasons set forth below, the court will grant the motion in part and deny in part the motion.

UNDISPUTED FACTS[1]

Hope Brennan began working for BNSF in April of 2013. On February 7, 2019, Brennan reported for her shift at BNSF's railyard in La Crosse, Wisconsin, at 10:00am. Specifically, she was assigned the position of brakeperson that day and instructed to build a train in the yard for travel to Illinois.[2]

Brennan worked on this task with a larger team, also including engineer Steve Watson, student engineer Jason Jensen, and conductor William Fausti. The team was

---

[1] In this section, the court provides an overview of the facts, which are undisputed except where noted. Additional facts are discussed as they become relevant to the analysis in the opinion below.

[2] Apparently, for whatever reason, the railroad continues to use the anachronistic term "brakeman" which is particularly inapt here since all the other titles are gender neutral and filled by men, while the plaintiff with the gender specific title identifies as female.

instructed to move two locomotives (BNSF "2031" and "265") already assembled on Track 103 to Track 108, where they would pick up another locomotive (BNSF "7492") and connect it to 265. While Watson, Jensen and Brennan went to assemble these locomotives, the conductor, Fausti, was connecting train cars on a third track, which would then be attached to the locomotives. Watson, Jensen and Brennan separately proceeded to start the engines of 2031 and 265 and brought those locomotives to 7492 for coupling.

Once 7492 was started, the engines were running for all three locomotives, but they were still idling -- that is not moving at the time of Brennan's accident. Watson was watching as student engineer Jensen attempted to couple the main reservoir hoses between 7492 and 265. However, because Jensen he was unable to raise the hoses high enough to do so successfully, Watson told him to stop attempting to couple the two hoses on that side of the locomotives and directed Fausti to examine those hoses. In turn, Watson and Jensen went to connect the hoses on the other side of the two locomotives.

Unfortunately, no one directly communicated the problem with the hoses to brakeperson Brennan, who after noticing that the main hoses between locomotives 7492 and 265 were still not laced, went to complete that task herself. More unfortunately, when Brennan lifted the hoses to couple them, she felt a pop in her shoulder, apparently causing her injury. Despite this, Brennan helped Watson and Jensen bring the three locomotives to Fausti to Track 108 and connect locomotive 7492 with the next train car.

Once there, Brennan told Watson and Jensen that her shoulder hurt and at that point, Watson called the trainmaster, who after arriving and took Brennan to urgent care for treatment. Six days after that, Brennan filed a personal injury report noting that the

hoses had been unusually stiff and hard to connect, causing her injury, which is now the subject of this lawsuit.

OPINION

I. Locomotive Inspection Act

Plaintiff first brings claims under the LIA, which requires that carriers only allow use of a locomotive that comports with certain safety conditions. 49 U.S.C.A. § 20701. "The first question for the Locomotive Inspection Act is whether the locomotive was 'in use' at the time of the accident." *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020), cert. granted in part, 142 S. Ct. 735 (2021), and aff'd, 142 S. Ct. 1582 (2022). BNSF thus argues that locomotive 7492 was not "in use" as contemplated by the LIA. While this question has a complicated history, current Seventh Circuit law compels this court to find that the locomotive was not "in use" and the LIA is not applicable.

The Supreme Court has interpreted this "use" requirement for the Safety Appliance Act, which contains extremely similar language to the LIA. There, the Court found that a car was in use despite being motionless and on a separate track, explaining that "the 'use, movement or hauling of the defective car,' within the meaning of the statute, had not ended when petitioner sustained his injuries." *Brady v. Terminal R. Ass'n of St. Louis*, 303 U.S. 10, 13 (1938). Despite what would appear to be a controlling interpretation by the Court, the "in use" standard has arguably been applied somewhat differently with different federal circuit courts. *E.g. Estes v. Southern Pacific*, 598 F.2d 1195, 1198 (10th Cir. 1979) (holding that a train car is in use if it is used for interstate traffic); *Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 329–30 (4th Cir. 1998) (holding that location, whether

3

the train was moving, and what the injured party was doing are all relevant considerations in deciding whether [car/locomotive or train] was "in use"); *Trinidad v. Southern Pacific Transportation Co.*, 949 F.2d 187, 189 (5th Cir. 1991) (holding that a train is only "in use" once assembled and the predeparture inspections have occurred.)

In 2019, the District Court for the Southern District of Illinois also considered the application of the "in use" standard in the context of a rail worker's slip and fall injury in *LeDure v. Union Pac. R.R. Co.*, No. 317CV00737JPGGCS, 2019 WL 399924 (S.D. Ill. Jan. 31, 2019) ("*LeDure I*").  In *LeDure I*, the district court found that the locomotive was not in use because "the train was (1) stationary; (2) on a backtrack in the depot yard; (3) had not yet been inspected or tagged; and (4) perhaps most importantly, the engineers had not yet assembled the cars on the train for its next use in interstate commerce." *Id.* at *4.

On appeal, the Seventh Circuit agreed, finding that a railcar is not in use when it is "stationary, on a sidetrack, and part of a train needing to be assembled before its use in interstate commerce." *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020) ("*LeDure II*").  The Seventh Circuit also disclaimed the more limited reading of this requirement advocated by plaintiff, which "essentially [sought] to limit [the court's] holding to say a locomotive is not 'in use' only when it is being repaired," finding "this is an unduly narrow reading." *Id*.  While the Seventh Circuit's analysis of the "in use" requirement may have been somewhat perfunctory, that court's affirmance effectively adopted the factors set forth by the district court in *LeDure I*.

In fairness, LeDure appealed this decision to the Supreme Court, which granted certification on the question of "[w]hether a locomotive is in use on a railroad's line and subject to the LIA and its safety regulations when its train makes a temporary stop in a

railyard as part of its unitary journey in interstate commerce, or whether such use does not resume until the locomotive has left the yard as part of a fully assembled train, as held by the Seventh Circuit below." *Bradley LEDURE, Petitioner, v. UNION PACIFIC RAILROAD COMPANY, Respondent.*, 2020 WL 7356624 (U.S.) at ii. However, the Supreme Court simply ruled that the Seventh Circuit's "judgment is affirmed by an equally divided Court." *LeDure v. Union Pac. R.R. Co.*, 142 S. Ct. 1582 (2022).[3] Given this unique procedural posture, the court acknowledges that the question of whether an unmoving, unassembled train on a sidetrack is "in use" under the LIA remains hotly disputed. However, the Supreme Court's 4-4 split means that the Seventh Circuit's opinion in *LeDure II* remains controlling law, at least in this circuit.

Plaintiff nevertheless tries to argue that *LeDure II* is inconsistent with previous Supreme Court precedent, such as *Brady*. However interesting this question may be in another court, it is beyond this court's scope. Regardless, the Seventh Circuit directly cites *Brady* in adopting its in-use standard, *LeDure II,* 962 F.3d at 910, leaving no room for the creative argument advanced by plaintiff even if this court were permitted to reconsider. As such, this court must apply *LeDure II* as the settled law of this circuit as to the requirement for a locomotive to be deemed "in use."

Here, three of the four factors cited in *LeDure I* and affirmed in *LeDure II* are squarely met. First, the *LeDure I* court noted that the train was stationary when *LeDure* was injured. No. 317CV00737JPGGCS, 2019 WL 399924, at *4. While plaintiff argues that locomotive 7492 was "not fully off" but "only idling," the locomotive in *LeDure* also

---

[3] Justice Barrett did not take part in the consideration of this case, as she had been a member of the Seventh Circuit panel that ruled on appeal.

had its engine running but was not moving. *LeDure II*, 962 F.3d at 909. As such, the locomotive in *LeDure* and the locomotives here were similarly stationary, and this factor strongly supports defendant's argument that the locomotives were not in use when Brennan was injured.

Second, the court noted that the locomotive in *LeDure I* was on a backtrack. No. 317CV00737JPGGCS, 2019 WL 399924, at *4. Here, the locomotives were on Track 108, separate from the coupled train cars. Brennan argues that this is still dissimilar because Track 108 "is not on a backtrack or repair track" (Pl.'s Opp'n. (dkt. #22) 19), but just as the district court found notable in *LeDure I*, the locomotives here were *separated* from the other cars and needed to switch tracks before the trial could be fully assembled. In its opinion, the court actually emphasized "just how much work needed to be done before the train would be ready for its next use in interstate commerce." *LeDure I*, No. 317CV00737JPGGCS, 2019 WL 399924, at *4. Here, too, the locomotive was on a separate track and had to be switched to a different track to even begin assembling the train itself. Thus, while the situation at hand may be different than *LeDure I*, the second factor also generally supports a finding that BNSF's train was not yet "in use."

Third, the train in *LeDure I* still needed to be assembled, which the district court found to be the most important factor: "In fact, LeDure specifically said at his deposition that 'the train was not set up and ready to go.'" *Id*. at *4. Brennan argues that the train in this case was "good to go" and "powered on in anticipation of imminent departure." (Pl.'s Opp'n. (dkt. #22) 19.) However, it is undisputed that the train cars and locomotives still needed to be assembled at the time Brennan was injured, making this argument untenable. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #35) ¶ 11.) Like the *LeDure*

6

train, the workers here needed to switch to different tracks and put the train together, which was "a considerable amount of work to be done before this locomotive was ready for its next trip in interstate commerce." *LeDure I*, No. 317CV00737JPGGCS, 2019 WL 399924, at *4. Thus, the assembly factor in this case also suggests the train was not in use.

The *only* factor arguably absent is whether the locomotives "had not yet been inspected or tagged," which is unclear from the facts provided by the parties at summary judgment. *LeDure I*, No. 317CV00737JPGGCS, 2019 WL 399924, at *4. Moreover, with the other, three factors all against a finding that the locomotives were "in use," one ambiguous factor, at best, is not enough to sway this court's ruling on summary judgment, particularly since plaintiff has the burden of proof. Additionally, the inspection factor is also the only factor *not* mentioned by the Seventh Circuit in *LeDure II*, casting doubt on its importance. 962 F.3d at 910. Ultimately, the 7492 locomotive was in much the same position as the locomotive in *LeDure I* when the plaintiff here was injured, making the two cases closely comparable. As such, the court finds that locomotives were not yet "in use" at the time of Brennan's injury, making the LIA inapplicable to this case. *LeDure I*, No. 317CV00737JPGGCS, 2019 WL 399924, at *5.

## II. Federal Employers' Liability Act

In contrast, the evidence necessary to survive summary judgment in a FELA case is minimal, and "[i]t is well established that, under FELA, a case must go to the jury if there is any probative evidence to support a finding of even the slightest negligence on the part of the employer." *Caillouette v. Baltimore & Ohio Chicago Terminal R. Co.*, 705 F.2d 243,

246 (7th Cir. 1983). This extremely low bar is more than met by Brennan here. While defendant offers several theories why it is not at fault for Brennan's injury, BNSF will have to advance those theories to the jury.

Specifically, plaintiff provides several bases for a reasonable jury to find the defendant's negligent under FELA. She first suggests that the airbrake system on the locomotive was defective, pointing to reported issues with the hose on 7492 both before and after her injury. (Pl.'s Opp'n. (dkt. #22) 24.) Brennan also notes that engineer Watson's testimony at his deposition points to evidence that the hoses seemed to be "defective" before Brennan tried to lift it. (*Id*. at 28.) Second, the railyard was slick with ice and snow during the incident, and Brennan argues that BNSF was negligent in not clearing that snow. (*Id*. at 32.) While causation may be more difficult for plaintiff to get to the jury on this theory, that will now have to be addressed at the final pretrial conference. Finally, Brennan argues that a Mertins Bar, which is a tool used to couple stiff hoses, would have prevented her injury and that BNSF is negligent in not providing that tool. (*Id*. at 33.) This, too, provides a basis for a reasonable jury to find negligence against defendant, at least on the record at summary judgment.[4]

In response, defendant argues that: the hoses were previously inspected, Brennan was not told to couple the hoses; and that Mertin bars are not used by trainyard staff. (Def.'s Op. Br. (dkt. #13) 8-12.) Yet Brennan has responded to each of these defenses, pointing out facts that potentially refute defendant's arguments. Whether the jury will

---

[4] Brennan moved to supplement her opposition brief (dkt. #40) due to recent deposition evidence. The court did not consider this evidence in this motion, as Brennan's brief already proved her FELA case sufficiently. Accordingly, that motion is DENIED AS MOOT.

give credence to either side's arguments is uncertain, but at the very least, plaintiff has provided evidence for a reasonable jury to find that employer negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957). Given the low bar for plaintiffs in FELA cases to survive summary judgment, Brennan has provided sufficient evidence to advance to trial on this claim.

ORDER

IT IS ORDERED that:

1) Defendant BNSF Railway Company's motion for summary judgment (dkt. #12) is GRANTED IN PART and DENIED IN PART.

2) Hope Brennan's motion to supplement (dkt. #40) is DENIED AS MOOT.

Entered this 26th day of September, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge